## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION

            Plaintiff,                       CASE NO.:

v.

CHEETAH X INC. (d/b/a Go X),
ALEXANDER DEBELOV,
and KHODR SALAM,

            Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
## AND DEMAND FOR JURY TRIAL

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### I.    INTRODUCTION

1.    From approximately July 2021 through November 2023, Defendants Cheetah X Inc., which does business as "Go X" ("Go X"); Go X's founder, majority owner, and CEO, Alexander Debelov ("Debelov"); and Go X's President of Operations, Khodr Salam, a/k/a Khodor Salam ("Salam") (collectively, "Defendants") raised approximately $4 million from about 300 investors located across multiple states, through the fraudulent and unregistered sale of securities.

2.    Go X operates a scooter rental business in markets including several Florida cities, Honolulu, and Las Vegas.  Defendants promoted Go X's investment program on its public website, in videos posted on YouTube, in direct communications with prospective investors, and in written agreements.

3.      In their sales pitch, Defendants represented to investors that Go X would pay investors a share of its gross profits from scooter rental fees, in exchange for the investors' principal payment to Go X, which typically ranged from $2,000 to $30,000.  They also represented that through the profit-sharing, investors could expect to be paid back their principal plus receive returns up to 100 percent in a year or less. The Go X website claimed that investors had earned more than $3 million by August 2022.  In addition, Defendants portrayed Go X as less risky than investing in the S&P 500, touting "guaranteed" investor refunds upon request and claiming that investor funds could be lost only if Go X went out of business.

4.      These representations were false and misleading.  By the end of 2023, Go X had paid investors only about $1.45 million—less than half of the approximately $4 million in principal it raised from investors.  Go X also failed to pay supposedly "guaranteed" refunds when investors requested them.  In addition, Go X operated a sharply unprofitable business, putting unwitting investors at substantial risk.

5.      The poor performance of the Go X investment led to multiple complaints from dissatisfied investors, yet Defendants continued to sell the investment with the same sales pitch.

6.      By engaging in the conduct described in this Complaint, Go X violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and Debelov and Salam violated Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), and 77q(a)(3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

2

7.      Unless enjoined, Defendants will continue to violate the federal securities laws. Accordingly, the Commission seeks injunctive relief and civil money penalties against the Defendants.   The Commission also seeks disgorgement of ill-gotten gains with prejudgment interest against Go X.

## II.   DEFENDANTS

8.      **Cheetah X Inc.**, which does business as "Go X," is a Delaware corporation formed in June 2018.  Go X operates its scooter rental business in Florida, Hawaii, and Nevada and sold its investment program to investors located across multiple states.

9.      **Alexander Debelov**, age 37, maintains residences in Hallandale Beach, Florida and San Francisco, California.  He is the founder of Go X and has been its CEO since June 2018. Debelov owns approximately 85 percent of Go X's stock and controlled Go X during the relevant period.

10.      **Khodr Salam**, age 30, resides in Sanford, Florida.  He has been a Go X employee since June 2018 and Go X's President of Operations since approximately March 2021.  Salam owns approximately two percent of Go X's stock.

## III.   JURISDICTION AND VENUE

11.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.      In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means and instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, or of the mails.

13.     This Court has personal jurisdiction over the Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because certain offers and sales of securities, acts, and transactions that form the basis for the violations alleged in this Complaint occurred in this District. For example, during the relevant time, Go X maintained an office in Miami, Florida which Debelov has described as Go X's "headquarters" and Debelov maintains a residence in this District. Additionally, at least six investors resided in this District when they invested.

## IV.    FACTUAL ALLEGATIONS

### A.    The Go X Business and Securities Offering

14.     Go X offers scooters for rent to the public in markets located in U.S. cities including Honolulu, Hawaii; Las Vegas, Nevada; Daytona Beach, Florida; and other Florida cities.  Go X pays a portion of the rental fees it collects to its "partners," which are the operators of the locations where the scooters are docked, typically retail stores and hotels in resort areas.

15.     From approximately July 2021 through November 2023, Go X raised around $4 million by offering and selling securities to approximately 300 investors in multiple U.S. states. Go X promoted its investment program through various means including content on its public website, which content was overseen and approved by Debelov, and videos posted to YouTube in which Debelov appeared and spoke as the company's CEO.  Debelov also personally promoted the Go X investment program to prospective investors, including through email and telephone conversations.

16.     When individuals expressed interest in the Go X investment through the Go X website, Debelov provided Salam with their contact information to follow up.  Salam then reached out to the prospective investors by telephone, email, and/or text message.  Salam described the

investment program to the prospects, including among other things, the expected rates of return and that investors would receive monthly payments of their returns.  He also directed prospects to the Go X videos on YouTube.

17.     About half of the investors signed written agreements with Go X to effect their investments ("investor agreements").  Debelov approved the form of the investor agreements. Using his CEO title, Debelov was also Go X's signatory on the investor agreements.  Both Debelov and Salam provided investors with investor agreements to sign, typically by emailing the investor a website link to an electronic copy of the agreement.  Investors that were not provided investor agreements effectuated their investment by paying Go X their principal investment amounts.

18.     Investors typically paid between $2,000 and $30,000 for an investment.  Some made multiple investments.  Investor funds were comingled in common bank accounts that Go X used to pay its general operating expenses.

19.     Investors were passive and had a reasonable expectation of earning a profit or return which was derived entirely from the purported efforts and strategies of the Defendants.  For example, the investor agreements stated:  "Go X will take care of all operations, provide the software solution, fix and deploy scooters at all partner locations.  Go X will also retain a legal firm, PR firm and run online ads in order to increase the rentability of scooters. . . .  All of this will help the [investor] recoup and earn . . . interest on their purchase in the most reasonable time frame."

20.     Echoing this language, Salam sent emails and text messages to prospective and existing investors stating variously that:  (i) "Investing in Go X is an opportunity to earn passive income by owning a percentage of our fleet;" (ii) investors were "tapping into" Go X's "total revenue" from all of its markets; and (iii) "You don't own 25 individual scooters; rather, you hold

a stake in the earnings generated collectively by 1,500 scooters across our Hawaii and Florida markets." Debelov also emailed existing investors representing that the Go X investment program offered "passive income."

21.     Indeed, Go X made the essential managerial efforts that affected the success or failure of its business and the investment program. This included, but was not limited to, launching operations in various markets; marketing scooters to consumers; recruiting, contracting with, and paying the partners; collecting scooter rental fees; maintaining the scooters; and handling permitting and other legal requirements of the cities where Go X operated.

**B. The Pitch to Investors**

22.     As Defendants framed the Go X program for investors—including in the investor agreements, on the Go X website, in the YouTube videos, and in Debelov's and Salam's direct communications with investors—investors would receive a share of the gross profits that Go X earned from renting scooters.

23.     In promoting the Go X investment program, Defendants told investors to expect that this profit-sharing would provide investors with extraordinary returns in a short period of time with exceptionally low risk.

24.     For example, Go X promoted the investment program with content on its public website that was overseen and approved by Debelov. At various times during the fraudulent offering, the website included the following claims:

- **"YOU MAKE $ WHEN SOMEONE RENTS A SCOOTER FROM US**. WE WILL SHARE 50% OF THE GROSS PROFIT" (emphasis in original)

- Through such profit-sharing, an investor could "1.5X YOUR MONEY" in as little as "88 days"

- "INVESTORS ON GO X PLATFORM EARNED" more than $3 million "IN THE LAST 180 DAYS"

- A person who "in August 2021 . . . invested $20k into Go X" would have achieved a "gain" of "+100%" by May 2022

- The 100 percent gain "is just compared [sic] based on returns, but if you look at other attributes of this investment like risk-tolerance, liquidity and your ability to lose money, then Go X stands in a completely different league (!) compared to all investments on the market"

- Unlike investors in the S&P 500, Go X investors had "0 Risk" and "[No] . . . Ability to Lose Money . . . *Unless Go X goes out of business"

25.     The promotion of the Go X investment program also included videos posted to YouTube in approximately October and November 2022.  In these videos, Debelov appeared and spoke over the caption "CEO, Go X."  He claimed that early investors had made returns of "I think it was 100 percent over twelve months" and that later investors were "getting a 50 percent return."

26.     In a separate YouTube video narrated by Debelov and posted in approximately June 2022, Debelov claimed that Go X provided investors with "monthly cash flow."

27.     Debelov and Salam also promoted the Go X investment in their direct communications with investors.  For example:

- Salam typically had phone calls with prospective investors in which he described how the Go X program worked, including the expected rate of return.

- In or about January 2023, Salam claimed in text messages to a prospective investor that the Go X "platform" was "completely sold out" and had "limited availability right now," but the prospect could invest a "max" of "$20k."  Salam also assured the prospect that he could

reasonably expect a fifty percent return in one year and would receive monthly payments from Go X.

- In a phone call around the same time, the prospect expressed skepticism to Salam that Go X could provide such a return, and Salam assured the prospect that Go X could do so.

- Salam and Debelov each sent prospective investors emails claiming that "our investors [had] made over **$3M on the platform**.  As we calculated the average rate of return across all markets, it came out to an astonishing **87% annual return for a typical investor on [the] Go X platform!**" (emphasis in original).  Their emails also claimed that the Go X investment was "no-risk," provided "monthly payouts," and "produces returns that are 4x of leading funds," and urged prospective investors to "see how it compares to other products on the market here: https://goxapp.com/invest."

28.     The investor agreements, which Debelov and Salam provided to investors, also touted the performance of the Go X investment.  Two iterations of the investor agreement were used, an original "1.0" version and a later "2.0" version.  These variously included statements that 1.0 investors could expect to "be paid" double their investment amount and expect to "earn that money anywhere between 3-6 months"; that the "majority" of 1.0 investors had "doubled or were on track to double their funds within 6-11 months of their initial investment"; that 2.0 investors "should expect to 1.5x their investment within 6-12 months"; and that 2.0 investors would "be paid monthly on their earnings."

29.     The investor agreements further stated that Go X provided a "100% product guarantee" and would refund investments upon investor request.  Consistent with this claim, in the June 2022 YouTube video identified above, Debelov said, "[I]f you're not happy with your investment, you can request a refund and we'll happily refund your money within that same day."

Likewise, in February 2023, Salam emailed a prospective investor a "welcome letter" from Debelov, which said: "At any point, if you would like to get your money back, then just email me . . . and I'll make sure you get it refunded to your card or wired within 24 hours."

### C. Defendants Violated the Antifraud Provisions of the Exchange Act and Securities Act

30.     Defendants knew, or were severely reckless in not knowing, that the sales pitch to investors was false and misleading because it overstated past performance of the Go X investment, overstated potential future performance of the investment, and understated investment risk.

31.     The claim that investors had "EARNED" more than $3 million "IN THE LAST 180 DAYS" suggested that the Go X investment had performed well in the past and that it was likely to continue to do so in the future.  But the claim was false and misleading.

32.     The claim first appeared on the Go X website no later than August 2022.  By then, however, Go X had only paid roughly $800,000 in returns to investors—far short of $3 million—according to its accounting records.  The claim was repeated on the website in December 2022 and in March, June, and September 2023.

33.     According to Go X accounting records, during the relevant time, Go X never returned $3 million to investors.  Through December 2023, Go X paid only approximately $1.45 million in returns to investors; in other words, Go X had returned less than half of the approximately $4 million in principal it raised from investors.  Debelov knew, or was severely reckless in not knowing, that the claim that Go X investors had earned more than $3 million in 180 days falsely and misleadingly portrayed the Go X investment's past and expected future performance because he regularly reviewed Go X accounting records showing the amount of returns paid to investors.  Debelov also knew, or was severely reckless in not knowing, that the

extraordinary past and expected future performance of the Go X investment touted elsewhere on the Go X website, in the investor agreements, in the YouTube videos, and in his emails to prospective investors, as described above, was likewise false and misleading.

34.     The sales pitch also falsely and misleadingly understated investment risk because Go X lacked the financial strength to perform as the pitch told investors to expect.  As Debelov knew, or was severely reckless in not knowing, from his review of Go X accounting records, Go X's scooter rental revenue during 2021 through 2023 totaled roughly $8.5 million—meaning it would take half of that revenue just to return the principal Go X raised from investors.  From the same accounting records, Debelov also knew, or was severely reckless in not knowing, that Go X recorded a negative net income in each of 2021, 2022, and 2023, with a cumulative recorded negative net income across the three years of approximately $1 million.  These facts cast serious doubt on the company's ability to return investor principal, let alone pay the touted extraordinary returns, and to guarantee refunds.  Debelov therefore also knew, or was severely reckless in not knowing, that the "0 Risk" claim and comparison to the S&P 500 on the Go X website described above were false and misleading.

35.     Investor complaints received by Debelov further show that Debelov knew, or was severely reckless in not knowing, that the Go X investment did not perform as represented in the investor sales pitch.  From at least June 2022 to November 2023, Debelov received multiple complaints from dissatisfied investors, including complaints about not receiving expected returns and unpaid refunds.  Yet Debelov and Go X continued promoting the investment to new investors using the same sales pitch containing misrepresentations about past performance, expected returns, and guaranteed refunds.

36.     Salam also knew, or was severely reckless in not knowing, that the Go X sales pitch was false and misleading.  Among other things, he monitored the Go X website, which contained the past and expected future performance claims described above; he described the Go X program to prospective investors, including the expected rates of return; he provided investors with the investor agreements, which included the claims of past and expected future performance as well as the refund guarantee described above; and he sent the emails to prospective investors referenced above describing past performance of the Go X investment.  Salam therefore knew, or was severely reckless in not knowing, that Go X, a small scooter rental company, implausibly offered investors the prospect of extraordinary returns, guaranteed refunds, and less risk than investing in the S&P 500.

37.     Salam also learned of investor complaints, as shown by the following examples:

- In June 2022, Salam was copied on an investor's email complaining to Debelov where the investor stated:  "I've reached out a few times and I'm wondering what I need to do to start getting my monthly payouts. . . .  It's been several months and I still have yet to get a single payout from my balance."  The investor had invested in November 2021.

- In August 2022, an investor complained to Salam and Debelov by email about not receiving monthly payments.  In February 2023, the investor complained again to Salam by email, copying Debelov, writing that he still was not receiving the payments.  Salam replied to the investor that the investor could expect a payment that week.  In March 2023, the investor emailed Salam, copying Debelov, noting that he did not receive the payment.

- In October 2022, an investor complained by email to Salam, stating:  "I am past my $5k payback and contract states that contract/agree [sic] make double your money which clearly I have not."

- In March 2023, an investor began complaining to Salam and Debelov in an email string about missing monthly payments.  Later in the string, in June 2023, the investor wrote:  "I am having trouble with payouts again. . . . Schedule [sic] payouts were never met."  In August 2023, the investor wrote in the string that he still was owed money.  He also wrote in an email to Debelov:  "I'm starting to feel like I got scammed."

- In April 2023, an investor emailed Salam and Debelov that he and two other individuals who were "early investors" in Go X had been receiving low payments or no payment in some months.  The investor also wrote:  "There has [sic] been constant inconsistencies with payment time frames . . . .  We are always having to reach out for our monthly deposits, asking several times for payment.  We are completely confused and lost as to what's going on with our money and need clarification."

- In May 2023, an investor complained by email to Salam and Debelov that she had invested in November 2022, and based on the investment performance so far, "it will take years to make a profit, as opposed to the 10 months I was told."

- In June 2023, Salam and Debelov received an email complaint from an investor stating that after approximately sixteen months, "I havent [sic] seen a return on my initial investment."

- In August 2023, an investor complained by email to Salam and Debelov that he had "asked kindly to withdraw my remaining $3,000 from my account for almost a year," adding, "I am turning all of this over to my lawyer next week if I don't hear back from you."

- Also in August 2023, an investor complained by email to Salam and Debelov that "[i]t has been almost 2 years with no [sic] even receiving my initial investment back which is laughable."  The investor also asked that Go X pay him his "remaining balance . . . or I will have no choice but to look at alternative options to get your attention."

- Additionally in August 2023, an investor complained by email to Salam, "I have not receive [sic] a payout"; "I want to pull out everything"; and "I will go to the proper authorities!"

38.     Even after receiving these complaints, Salam continued using the false and misleading sales pitch to solicit investors.  In particular, after the August 2023 complaints, Salam went on to sell investments tied to a new market Go X was launching in Las Vegas.

39.     Despite the investor complaints, and the implausible returns, purported low risk, and guaranteed refunds touted in the Go X sales pitch, Salam never investigated the truthfulness of the representations he used to solicit investors.

40.     The false and misleading representations that Defendants disseminated to investors in the sales pitch described above were material.  In making an investment decision, it would have been important for a reasonable investor to know, for example, that the purported past performance of the Go X investment, including the repeated $3 million claim, was false; that Go X failed to pay refunds upon request; and that Go X was unprofitable.

**D.  Defendants Violated Federal Securities Registration Provisions**

41.     As stated above, Go X, through Debelov and Salam, offered and sold approximately $4 million in securities to approximately 300 investors residing in multiple states.  In doing so, Defendants used general solicitation, including a public website and YouTube videos, and did not take reasonable steps to verify investors' accredited investor status.

42.     Contrary to the requirements of the federal securities laws, no registration statement was on file with the Commission or in effect for any of these offers or sales, and no exemption from registration applied to the offers or the sales.

## V.    CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)
### (Against all Defendants)

43.    The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

44.    From approximately July 2021 through November 2023, Go X, Debelov, and Salam, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, knowingly or severely recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

45.    By reason of the foregoing, Go X, Debelov, and Salam directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)].

### COUNT II

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against all Defendants)

46.    The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

47.    From approximately July 2021 through November 2023, Go X, Debelov, and Salam, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or severely recklessly made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     By reason of the foregoing, Go X, Debelov, and Salam directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c)
### (Against all Defendants)

49.     The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

50.     From approximately July 2021 through November 2023, Go X, Debelov, and Salam, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or severely recklessly engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

51.     By reason of the foregoing, Go X, Debelov, and Salam directly or indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)].

## COUNT IV

### Violations of Section 17(a)(1) of the Securities Act
### (Against all Defendants)

52.     The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

53.     From approximately July 2021 through November 2023, Go X, Debelov, and Salam, in the offer or sale of securities by use of the means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or severely recklessly employed devices, schemes, or artifices to defraud.

54.     By reason of the foregoing, Go X, Debelov, and Salam directly and indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## **COUNT V**

### **Violations of Section 17(a)(2) of the Securities Act**
### **(Against Go X)**

55.     The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

56.     From approximately July 2021 through November 2023, Go X, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly and indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

57.     By reason of the foregoing, Go X directly and indirectly violated and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77(q)(a)(2)].

## **COUNT VI**

### **Violations of Section 17(a)(3) of the Securities Act**
### **(Against all Defendants)**

58.     The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

59.     From approximately July 2021 through November 2023, Go X, Debelov, and Salam, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly and indirectly, negligently engaged in transactions, practices, and courses of business which operated as a fraud or deceit upon the purchasers.

60.     By reason of the foregoing, Go X, Debelov, and Salam directly and indirectly violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77(q)(a)(3)].

## COUNT VII

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

61.     The Commission realleges and incorporates Paragraphs 1 through 42 of this Complaint.

62.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issuances and transactions by Defendants as described in this Complaint, and no exemption from registration existed with respect to these securities and transactions.

63.     From approximately July 2021 through November 2023, Go X, Debelov, and Salam directly or indirectly:

   a.  made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

b. carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

c. made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

64.     By reason of the foregoing, Go X, Debelov, and Salam directly or indirectly violated and, unless enjoined, are  reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## VI.    **REQUESTED RELIEF**

The Commission respectfully requests the Court find that the Defendants committed the foregoing violations, and:

### A. Permanent Injunction

Issue a permanent injunction enjoining Go X, Debelov, and Salam from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; permanently enjoining Go X from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and permanently enjoining Debelov and Salam from directly or indirectly violating Section 17(a)(1) and Section 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

**B. Disgorgement with Prejudgment Interest**
**(Against Go X)**

Issue an order requiring Go X to disgorge all ill-gotten gains or proceeds, with prejudgment interest thereon, resulting from the acts and/or courses of conduct alleged in this Complaint.

### C. Civil Monetary Penalties

Issue an order requiring Go X, Debelov, and Salam to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### D. Retention of Jurisdiction

Retain jurisdiction of this action and over the Defendants in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

### E. Further Relief

Grant such other and further relief as this Court may determine to be just, equitable, and necessary.

### <u>DEMAND OF JURY TRIAL</u>

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Respectfully submitted,

July 3, 2025

*s/Christine Nestor*
**Christine Nestor, Esq.**
Senior Trial Counsel
Florida Bar # 597211
Telephone: (305) 982-6367
E-mail:  nestorc@sec.gov

**ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154