**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

SECURITIES EXCHANGE COMMISSION        Case No.: 1:25-cv-23002-BB

       Plaintiff,

v.

CHEETAH X INC. (d/b/a Go X),
ALEXANDER DEBELOV,
And KHODR SALAM,

Defendants.

_____/

**DEFENDANTS, CHEETAH X INC., d/b/a GO X, ALEXANDER DEBELOV, AND**
**KHODR SALAM, MOTION TO DISMISS PLAINTIFF'S COMPLAINT[1]**

Defendants, CHEETAH X INC. d//b/a GO X ("Cheetah X"), ALEXANDER DEBELOV

("Mr. Debelov"), and KHODR SALAM ("Mr. Salam") (collectively, the "Defendants"), by and

through its undersigned counsel, and pursuant to Federal Rules of Civil Procedure 12(b)(6), and

Local Rule 7.1(a), hereby files its Motion to Dismiss Plaintiff SECURITIES EXCHANGE

COMMISSION (the "SEC" or "Plaintiff") Complaint [D.E. 1] (the "Complaint")[2] and in support

thereof states as follows:

---

[1] Defendants, in conjunction with this Motion to Dismiss, are concurrently filing a Motion to Transfer Venue for *forum non conveniens* to the Middle District of Florida, Tampa Division. Defendants are filing their Motion to Transfer Venue under U.S.C. § 1404(a), which is not same as a Rule 12(b)(3) motion, and thus it does not need to be consolidated with their Motion to Dismiss. *Aalberg v. Plan 4 Coll., Inc.*, No. 809-CV-1393-T-27EAJ, 2009 WL 3698039, at *1 (M.D. Fla. Nov. 4, 2009). In *Aalberg*, the court held that a party was "not required to consolidate their motion to transfer venue pursuant to 28 U.S.C. § 1404(a) with their earlier motion to dismiss for failure to state a claim." *Id. See also MSPA Claims 1, LLC v. Halifax Health, Inc.*, No. 17-20706-CIV, 2017 WL 7803813, at *2 (S.D. Fla. Oct. 13, 2017) (noting that a motion to transfer to a more convenient venue under 28 U.S.C. § 1404(a) is not subject to the waiver under Rule 12(h)).

[2] The SEC brought this action against the Defendants after the 180 day deadline following a Wells notification in violation of 15 U.S.C.A. § 78d-5(a)(1) ("Not later than 180 days after the date on which Commission staff provide a written Wells notification to any person, the Commission staff shall either file an action against such person or provide notice to the Director of the Division of Enforcement of its intent to not file an action.").

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

## SUMMARY OF THE ARGUMENT

The SEC's Complaint miscasts a legitimate consumer business as a fraudulent securities scheme. Go X is an innovative scooter rental company founded in 2018, operating in tourist-heavy markets such as Florida, Hawaii, and Nevada. Complaint ¶¶ 2,8. Between 2021 and 2023, Go X began selling fleets of scooters to consumers pursuant to written sales agreements. *Id*. at ¶ 15. These agreements identified purchasers as "buyers," conveyed ownership of tangible scooters, provided warranties and refund rights, and permitted tracking of scooter performance through Go X's platform. Customers who purchased scooters could earn income from rentals in their chosen markets, much like purchasers of vending machines or rental properties.

Despite this framework, the SEC now seeks to label the scooter sales as unregistered "securities offerings." *Id*. at ¶¶1-3, 41-43. That conclusion cannot stand. The securities laws regulate financial instruments such as stocks, bonds, and investment contracts, not the sale of consumer goods accompanied by the possibility of generating revenue. The economic reality here was straightforward: buyers purchased a good (scooters) from Go X, not securities. Thus, the sale of the scooters does not fall within the purview of the SEC's enforcement authority.

Even if the Court were to analyze the transactions under the *Howey* test, the SEC has not plausibly alleged the required element that profits derive solely from the effort of others. Returns depended on external factors outside Defendants' control-mainly seasonality. That Go X provided operational support does not transform these sales into securities.

Further, the SEC's fraud claims fail Rule 9(b)'s heightened pleading requirements. The Complaint offers only broad conclusions that Defendants "knew" or were "reckless," citing their familiarity with financial records or customer inquiries, without alleging particularized facts showing scienter. In reality, contemporaneous communications reflect that the customer issues

2

amounted to little more than routine customer service issues, and did not reflect negligent or severely reckless intent by the Defendants.

Accordingly, as further explained herein, since the transactions at issue were sales of goods, not securities, and because the SEC has failed to plead scienter or negligence with the requisite specificity, the Complaint must be dismissed in its entirety.

## FACTUAL BACKGROUND

This case arises from the SEC's allegations that Defendants engaged in the unregistered offer and sale of securities by offering scooters for sale.[3] *See generally*, Complaint. Go X is a Delaware corporation founded in 2018, by Mr. Debelov and Mr. Salam, that operates scooter rental business in cities across Florida, Hawaii, and Nevada. Complaint ¶¶ 2,8. Go X partners with local businesses, including hotels, and retails establishments. *Id.* at ¶14.

The SEC purports that from July 2021 through November 2023, Go X raised approximately $4 million from about 300 individuals through its sales of scooters to customers. *Id*. at ¶ 15. According to the Complaint, customers typically paid between $2,000 and $30,000 to purchase scooters, with some customers purchasing multiple scooters. *Id*. at ¶ 18. In exchange, customers entered into written agreements or otherwise provided payment to Go X and Go X deployed their customers' scooters in markets where they could be rented by the public. *Id*. at ¶21.

The SEC alleges that customers expected to receive passive income from the scooters' rental proceeds, with Defendants promoting the transactions through a website, YouTube videos, and direct communications. *Id*. at ¶¶ 19-24. The Complaint further claims that Mr. Debelov and Mr. Salam were involved in providing information to prospective customers and supplying sales agreements for execution. *Id*. at ¶ 27.

---

[3] As an initial matter, the Defendants deny all allegations contain within the Complaint.

Based on these allegations, the SEC asserts that Defendants engaged in unregistered securities offerings and made material misrepresentations in violation of federal securities laws. *See generally* Complaint. For the reasons stated herein, the SEC's Complaint should be dismissed with prejudice.

### SECURITIES ACT AND SECURITIES EXCHANGE ACT BACKGROUND

The Securities Act ('Securities Act") and the Securities Exchange Act (the "Exchange Act") were enacted in the wake of the 1929 stock market collapse to regulate securities markets and restore investor confidence. Elisabeth Keller & Gregory A Gehlmann, I*ntroductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*, 49 Ohio St. L. J. 329, 329 (1988). The Securities Act originally focused on regulating new issues of securities, ensuring disclosure so that investors understood what they were purchasing. *Id.* at 343. The Exchange Act, as originally promulgated, was intended to stop specific exchange abuses such as speculation, like short selling and margin trading, and market manipulation. *Id.* at 348. Importantly, the Exchange Act regulates "the securities exchange markets and the operations of the corporations listed on the various national securities exchanges (such as the New York and American stock exchanges)." *Id*. at 330. The Exchange Act was implemented "to restore investors' confidence in the financial markets, and the term security was meant to include the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Marine Bank v. Weaver*, 455 U.S. 551, 555-556, 102 S. Ct. 1220, 1223 71 L. Ed. 2d 409 (1982) (internal quotations and citations omitted).

"The securities laws were enacted with traditional, publicly-traded stocks and bonds foremost on the public mind." 22 Am. Jur. Proof of Facts 3d 485, § 6 (1993). "The federal securities laws were enacted to protect investors from placing their money in business enterprises operated

by others without first being made aware of all the relevant facts." *Id.* at § 13. Beginning in 1943, the Supreme Court began to expand this analysis to oil and gas production and orange groves. *Id.* at § 8. However, by enacting the Securities Act and the Exchange Act, "Congress did not intend to provide a broad federal remedy for all fraud." *Chao Xia Zhang -Kirkpatrick v. Layer Saver LLC*, 84 F. Supp. 3d 757, 762 (N.D. Ill. 2015) (citing *Marine Bank* 455 U.S. at 556, 102 S. Ct. at 1223). Courts are tasked with deciding which transactions fall within the purview of the Securities Act and Exchange Act, placing emphasis on the economic reality of the situation. *Id*. Consistent with this legislative history, Congress did not intend the securities laws to regulate the ordinary sale of consumer goods, such as scooters. Rather the Securities Act and the Exchange Act were enacted to restore confidence in the nation's financial markets by targeting speculative securities and market manipulation, not the purchase of tangible, movable goods.

## <u>LEGAL MEMORANDUM</u>

### I.      Motion to Dismiss Standard

Rule 8 of the Federal Rules requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on " 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955 (alteration in original)). "Factual allegations must be enough to raise a right to

5

relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. These elements are required to survive a motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requests dismissal for "failure to state a claim upon which relief can be granted."

Moreover, a pleading that contains securities fraud claims are subject to the heightened pleadings standards set forth in in Rule 9(b) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 9(b); *see S.E.C. v. Bankatlantic Bancorp, Inc.,* 12-60082-CIV, 2012 WL 1936112, at *7-10 (S.D. Fla. 2012); *S.E.C v. Ginsburg,* 99-8694C-IV, 2000 WL 1299020, at *2 (S.D. Fla. 2000) ("[a]llegations of security fraud under § 10(b) and Rule 10b-5 are subject to the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b)."). Rule 9(b) states that "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) serves an important function of alerting defendants of exactly what misconduct is alleged and protecting defendants from false charges of fraud. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370-71 (11th Cir. 1997) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)). In applying Rule 9(b), the Eleventh Circuit has required complainants to meet four specific requirements for securities fraud:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Further, the Rule 9(b) standard is met when the Plaintiff pleads "the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F.Supp.2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955; *see Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682, 129 S.Ct. 1937). A court considering a Rule 12(b)6) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. See *Wilchombe v. TeeVee Toons*, *Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)). Here, Plaintiff fails to plead enough facts sufficient to support their claims and thus Plaintiff's Complaint must be dismissed with prejudice.

## ARGUMENT

II.   **The SEC Does Not Have Enforcement Authority to Bring This Suit Because the Purchase of Scooters Are Not Securities**

The SEC brings claims in this action under both the Securities Act and Exchange Act. Those acts, in turn, apply only to financial instruments that qualify as securities. *See, e.g.*, 15

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

U.S.C. § 77q(a) (securities fraud claim under Securities Act must be in connection with offer or sale of "securities"); 15 U.S.C. § 78j(b) (securities fraud claim under Exchange Act must be in connection with purchase or sale of "security"). The SEC therefore has no authority to bring an enforcement action—and cannot state a cognizable claim—under these Acts unless it pertains to the offer or sale of securities. *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1285 (11th Cir. 2007) ("To reach the question of an alleged violation of the anti-fraud provisions of the Securities Acts, the transaction at issue must involve a 'security' as defined in the 1934 Act."). As further explained herein, the SEC's Complaint must be dismissed with prejudice because it failed to plead that the scooters sold by Defendants are securities.

### a. The SEC's Claim Against Defendants Should be Dismissed Because the Sale of Scooters Does not Fall Within the Ambit of the Definition of Securities

The Securities Act defines securities broadly, holding a security to include any:

> note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C.A. § 77b(a)(1); *see also* 15. U.S.C.A § 78c(a)(10). Notably, the statutory definition does not consider the sale of goods, including scooters, to constitute a security. Despite the absence of tangible goods, including scooters, from the definition of "security" the SEC's Complaint makes the improper legal conclusion that the selling of the scooters is a security, which "Go X raised around $4 million by offering and selling…" Complaint ¶ 15. *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 ("Courts are not bound to accept as true a legal conclusion couched as a factual

8

allegation."). The SEC further claims that GO X operated an "investment program" relying on the "investor agreements" that some of Go X's customers executed upon the purchase of their scooters. *Id*. at ¶¶ 15-19. Pertinently, "investor program" and "investor agreement" are not within the definition of "security" either.

However, a review of these "investor agreements" alleged by the SEC demonstrates that these were sales agreements for the purchase of scooters, which provided the owners of the scooters an opportunity to earn income from renting out the scooters in the markets Go X operates in. *See* Go X Sales Agreements, attached **Exhibit 1** (the "Sales Agreements").[4] Indeed, the Sales Agreements show that Go X's customers are "Buyers" that were purchasing scooters or "Goods" from Go X. *Id*. It is incontestable that the substance of the Sales Agreements was to effectuate the sale of goods between the buyer and Go X. *Id*. The Uniform Commercial Code ("UCC") defines "goods" to be "all things (including specially manufactured goods) which are movable at the time of the identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action." UCC § 2-105(a); *see also* Fla. Stat. § 672.105(1) (defining "goods" as "all things ... which are movable at the time of identification to the contract for sale."). Based on this definition, it is indisputable that the scooters sold by Go X are a good "that is movable at the time of the identification to the contract." *Id*.; *see Toca v. Tutco, LLC*, 430 F. Supp. 3d 1313, 1322 (S.D. Fla. 2020) (Holding that the sale of HVAC units "are undeniably goods"); *see also BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1329-1330 (11th Cir. 1998).

---

[4] The attachment and incorporation of the Go X Sales Agreements is proper because they are referred to in the SEC's complaint and are central to its claims that Go X's scooter sales qualify as a security. *See* Complaint ¶¶ 19, 28-29; *see also Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)).

As evidenced by the Sales Agreements, customers purchased a quantified "fleet of electric scooters" from Go X for a set price. *See* Sales Agreements. Buyers were permitted to purchase up to 15 scooters and were provided receipts for their purchases by Go X. *Id*. Buyers had the ability to track their scooters via the Go X platform and could receive refunds at their request. *Id*. Further, through the Sales Agreements, Go X made express warranties and representations pertaining to the quality of its scooters, inspections, and attachment of liability to any damages arising from the use or purchase of the scooters. *Id* at ¶ 6 ("Go X warrants that the Goods shall be free of substantial defects in material and workmanship"); *see also* UCC § 2-313 (detailing when express warranties are created). The Sales Agreements further provides that "[i]f Buyer, in good faith, determines that all or a portion of the Goods are non-conforming, Buyer may return the Goods to Go X at Go X's expenses…Go X will have 30 days from the return of the Goods to remedy such defects under the terms of this Agreement" *Id*. at ¶ 7; *see also* UCC § 2-508 (Providing seller a period to cure a non-conforming good); *see also* UCC § 2-601 (Provision discussing buyer's options following the delivery of a nonconforming good). Each of these provisions in the Sales Agreements are commonly associated with the sales of a good, and not the sale of a security. *See* UCC § 2-106(1) (defining "Contract for sale" to include "a present sale of goods"); *see also* UCC § 2-508(1) (UCC provision discussing when a seller can cure a non-conforming good that was rejected by the buyer). The Sales Agreements merely provide the sales of goods with the option for customers to obtain income from renting out the scooter. *See* Sales Agreement. Importantly, goods do not fall within the purview of the securities definition nor the SEC's enforcement authority. *See, e.g*., 15 U.S.C. §§ 77b(a)(1), 77q(a); 15 U.S.C. § 78b(a)(1), 78j(b). The fact that investors may obtain rental income from the purchase of their scooters does not transform the good into a security. *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986); *see also Mosher v. Southridge*

10

*Assocs., Inc.*, 552 F. Supp. 1231, 1233 (W.D. Pa. 1982).  Therefore, the SEC's allegation that customers purchased the scooters with the intention of obtaining rental income does not provide the necessary facts to sustain this action under the Securities Act and Exchange Act.

Defendants anticipate that the SEC will point to the language in the Sales Agreement discussing the purchase of scooters as an "investment," referring to the customers as "investors," and discussing the income customers should expect to receive from the scooter rentals, to argue that the sale of the scooters constitute a security and not a good. However, when examining whether a transaction constitutes an investment, courts look to the "economic realities underlying a transaction, and not on the name appended thereto." *United Hous. Found. Inc. v. Forman*, 421 U.S. 837, 849 (1975); *see also United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018). Here, the economic reality of the Sales Agreements demonstrates that this transaction was, first, a sale of goods, and second, an opportunity to earn rental income on the goods purchased. That the Sales Agreements were referenced as an investment or discussed the potential profits that buyers can obtain has no effect on what occurred. As shown by the Sales Agreement, the customers purchased the scooters to own, accompanied by representations and warranties made by Go X. *See* Sales Agreements. Through this purchase, the customer could have been compensated by renting out the scooter. Without more, the sale of these scooters are goods, not securities, and thus, the SEC does not possess the proper authority to maintain this action. Accordingly, the SEC's Complaint must be dismissed with prejudice.

### b.  Alternatively, Plaintiff Failed to Sufficiently Plead the Third Element of the *Howey* Test.

Alternatively, if the Court finds that the SEC has sufficiently alleged that Go X's sale of the scooters were part of an "investment contract," the SEC's Complaint must still be dismissed because the SEC did not properly allege the third element of the *Howey* test. *SEC v. W.J. Howey*

*Co.*, 328 U.S. 293, 298-99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey* the U.S. Supreme Court defined an investment contract as "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter of third party." *Id*. The Eleventh Circuit, applying the *Howey* test, holds that an "investment contract" qualifies as a security if there is "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999). A plaintiff seeking to allege a transaction is an "investment contract" must plead each element "to a very substantial degree." *Teamsters v. Daniel,* 439 U.S. 551, 560 (1979).

Under the third prong of *Howey*, control is the most crucial factor to consider. *Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (citing *Albanese v. Florida Nat'l Bank*, 823 F.2d 408, 410 (11th Cir.1987)). To show the third element of the *Howey* test, courts focus "on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party." *Alunni*, 445 F. App'x at 296. "An investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in group ventures, is not dependent upon the managerial skills of others." *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982). Moreover, when "the ability of the seller to perform is dependent, in part, on both his managerial skill and some good fortune" courts have found that the third prong has not been satisfied. *See S.E.C. v. Belmont Reid & Co.,* 794 F.2d 1388, 1391 (9th Cir. 1986) (Holding that the profits of gold coins were dependent upon "the fluctuations of the gold market, and not the managerial efforts of the seller"); *see also Noa v. Key Futures, Inc.,* 638 F.2d 77 (9th Cir.1980); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359, 367 (S.D.N.Y.1966).

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Here, the SEC asserts the legal conclusion that Go X's scooters are securities, claiming that the third element is satisfied because the "[i]nvestors were passive and had a reasonable expectation of earning a profit or return which was derived entirely from the purported efforts and strategies of the Defendants." Complaint at ¶ 19. The SEC supports this allegation by citing to the Sales Agreements, which states that "Go X will take care of all operations, provide the software solutions, fix and deploy scooters at all partner locations. Go X will also retain a legal firm, PR firm, and run online ads in order to increase rentability of scooters…All of this will help the buyer recoup and earn 100% interest on their purchase in the most reasonable time frame." *Id*.; *see* Sales Agreement.

However, the SEC conveniently overlooks the provision one paragraph above the one cited to in the Sales Agreements, which states that the profit from the rental scooters may fluctuate "due to seasonality…". Sales Agreement. The rental income owners received from their scooters is dependent on the number of rides their scooters received. *Id*. The market is people, and this market consistently fluctuates due to a variety of factors outside of the control of the Defendants. Although Go X selects the locations which they deploy the scooters, Go X maintains no control over when people decide to visit these markets, which directly correlates with the profit earning opportunities afforded to the scooter owners. In other words, for the buyers to obtain rental income from their scooters, they need some "good fortune" outside the control of the managerial skills of the Defendants. *Belmont Reid & Co.,* 794 F.2d at 1391; *see also Noa v. Key Futures, Inc.,* 638 F.2d 77 (9th Cir.1980); (holding that the sale of silver bars was not an investment contract because the expected profits came from market fluctuations); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 253 F.Supp. 359, 367 (S.D.N.Y.1966) (holding that contracts to purchase sugar for

future delivery were not "investment contracts" because the expected profits came from market fluctuations).

Moreover, the buyers retain control over their purchase of the scooters as acknowledged by the Sales Agreements. Specifically, the Sales Agreements provide that the buyers may, at any time prior to receiving the scooter's full value in rental profits, return their scooters to Go X in exchange for the full purchase price. Sales Agreement ¶ 6. This further illustrates that Go X does not possess the requisite control over the profits of the buyers, as the buyers, at their complete discretion, may request a refund for their scooters.

Therefore, since the ability of Go X to perform for the buyer requires the good fortune of people visiting the scooter deployment locations, and the buyer can request a refund of their purchase, the success of the scooter rentals is not sufficiently related to the efforts of the Defendants, thus the scooter transactions are not a security under the Securities Act or the Exchange Act. Accordingly, the scooters are not securities under *Howey* and the SEC does not possess the requisite enforcement authority to bring this action.

### III. Counts I-III, Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a)-(c), and Counts IV-VI, Violations of Section 17(a)(1)-(a)(3) of the Securities Act, Have Not Been Sufficiently Alleged.

In its Complaint the SEC failed to properly allege that the Defendants violated Rule 10b-5 and Section 17(a). *See generally* Complaint. Under Rule 10b-5 it is unlawful to "(a)employ any device, scheme, or artifice to defraud"; (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading"; and (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a)-(c).

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Similarly, Section 17(a)(1) makes it unlawful "to employ any device, scheme or artifice to defraud"; subsection 17(a)(2) makes it unlawful: "to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made ... not misleading"; and subsection 17(a)(3) makes it unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

To establish a violation of Section 10(b) and Rule 10b-5, the SEC must prove by a preponderance of the evidence that each respective defendant made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities," and that they "(3) made [them] with scienter*." S.E.C. v. Merch. Capital, LLC*, 483 F.3d 747, 766 n.17 (11th Cir. 2007) (citing *Aaron v. S.E.C.,* 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)); *S.E.C. v. Zandford*, 535 U.S. 813, 816 n.1 (2002). A complaint alleging claims under Section 10(b) and Rule 10b-5 must satisfy the heightened pleading requirements established under Rule 9(b) of the Federal Rules of Civil Procedure. *S.E.C. v. Strebinger*, 114 F. Supp. 3d 1321, 1329 (N.D. Ga. 2015) (citing *Kammona v. Onteco Corp.*, 587 Fed.Appx. 575, 581 (11th Cir. 2014)). To do so, a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Scienter must be found with respect to each defendant on an individual basis. *Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1017–18 (11th Cir. 2004).

To show a violation under Section 17(a)(1), "the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities; (3) made with scienter." *Merch. Capital, LLC*, 483 F.3d at 766 (citing *Aaron*, 446 U.S. at 695). Meanwhile, to show a violation under Section 17(a)(2) and (3), "the SEC need only show (1)

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Id*.

>   **a.   The SEC Fails to Establish Scienter or Negligence Against the Defendants with Respect to Any Purported Material Misrepresentations or Omissions**

As discussed above, for violations of section 10(b) or Rule 10b-5(a)-(c) or Section 17(a)(1), the SEC must also allege that the defendant acted with scienter. *Merch. Capital, LLC*, 483 F.3d at 766 (citing *Aaron*, 446 U.S. at 695).   Courts holds that for claims brought under Rule 10-b-5(a), (c) or Section 17(a)(1), (3) the "SEC must show that (1) the defendant committed a deceptive or manipulative act (2) in furtherance of the alleged scheme to defraud." *SEC v. Complete Bus. Sols. Grp., Inc*., 538 F. Supp. 3d 1309, 1339 (S.D. Fla. 2021). For Section 17(a)(1) the SEC must show scienter, and for Section 17(a)(3) the SEC must show negligence. *Id*. Scienter is a mental state showing an intent to deceive, manipulate, or defraud, and it can be established by showing a defendant acted in knowing misconduct or severe recklessness. *SEC v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309, 1330 (S.D. Fla. 2021).

Although the SEC only needs to generally plead scienter, it must still "allege plausible facts or suggest reasonable inferences that, if taken as true, would support a finding of scienter. *Sec. & Exch. Comm'n v. Westhead*, 733 F. Supp. 3d 1284, 1303 (S.D. Fla. 2024) (citations omitted). "To show severe recklessness, the SEC must demonstrate 'that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Complete Bus. Sols. Grp., Inc.* 538 F. Supp. 3d at 1330 (quoting *Monterosso*, 756 F.3d at 1335).

Here, the SEC has failed to plead that the Defendants acted with scienter when promoting the sale of their scooters and the income associated with the rental of such scooters. Throughout its Complaint, the SEC concludes, that Mr. Debelov and Mr. Salam either knew or were severely

16

reckless with the representations about the profitability of the scooter rentals, without sufficiently pleading how. *See* Complaint ¶¶ 30-40. In fact, the Complaint attempts to allege scienter by relying on circumstantial evidence of severe recklessness, but the allegations fall short of a "finding of scienter."

### i.  The SEC Does Not Establish Mr. Debelov Acted with Scienter

As it relates to Mr. Debelov, these claims must fail because they are contradicted by the very Sales Agreements which the SEC frequently cites. The SEC alleges that Mr. Debelov knew or was severely reckless in not knowing that Go X did not have the "financial strength" to perform as represented to the purchasers. *Id*. at ¶34. To support this, the SEC points to Mr. Debelov's familiarity with Go X's accounting records, possessing knowledge of Go X's revenue and net income between 2021-2023. *Id*. However, this does not establish that Mr. Debelov acted with scienter, as the Sales Agreements makes clear that the owners rental income is completely isolated from the performance of Go X's financial performance. *See* Sales Agreements ¶ 4. Specifically, The Sales Agreements represent:

> The buyer is purchasing a percent of the fleet and will be compensated accordingly. In other words, if there are 200 scooters in the market and the buyer purchases 20 scooter fleet, then the buyer's compensation will be calculated as 10% of the entire fleet… Scooters will be rented by Go X in the Honolulu market. The buyer will be paid for each rental that occurs in 80% / 20 % of the gross profit, whereas 80% will go towards the buyer and 20% will go to Go X. The gross profit is calculated by deducting gross revenue - partner payments -operations cost = gross revenue.

*Id*. As this provision makes clear, the scooter rental income was tied to fleet performance in the marketplace, not Go X's company-wide financial health. Whether Go X itself was profitable or not, investor payouts turned on scooter rental, not on the company's consolidated financial results. The SEC's scienter allegations, therefore, rest on a faulty premise – that knowledge of Go X's financial results equates to knowledge that rental income profits were false and/or the returns were

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

overstated. That logical gap is fatal to the SEC's allegations of scienter. *See Henningsen v. ADT Corp.,* 161 F. Supp. 3d 1161, 1205 (S.D. Fla. 2015) (citing *Chiarenza v. IBSG Int'l, Inc.*, 2010 WL 3463304, at \*7 (S.D. Fla. Sept. 2, 2010) ("[K]nowledge is not enough to establish scienter."); *see also Hershey v. Energy Transfer Partners*, LP, 610 F.3d 239, 249 (5th Cir. 2010)

The SEC also claims that Mr. Debelov "knew or was severely reckless in not knowing" that the scooter rentals were not performing as he represented because of purported "complaints" he received between June 2022 to November 2023 from scooter owners. Complaint at ¶¶ 35-37. However, these alleged "complaints" are cherry-picked, partial email chains by the SEC, completely devoid of context. These isolated "complaints" further fail to meet the heightened pleading standard required under Rule 9(b) to allege scienter on behalf of Mr. Debelov. The emails selected by the SEC show nothing more than typical customer service issues that tend to arise when running a successful business, such as Go X.

These examples undermine the SEC's theory of scienter. Contemporaneous emails show not "knowing misconduct" or "extreme recklessness" but routine customer-service issues. These facts do not support a claim for scienter, much less negligence. Here, the SEC's allegations show neither intent to defraud or severe recklessness. Accordingly, the scienter elements fail and the claims under Section 10(b), Rule 10b-5(a)-(c), and Section 17(a)(1) must be dismissed. *S.E.C. v. Mannion,* 789 F. Supp. 2d 1321, 1342 (N.D. Ga. 2011) (The SEC "must allege plausible facts or suggest reasonable inferences, that, if taken as true, would support a finding of scienter.").

Further, for these same reasons that the SEC fails to plead scienter, the Complaint fails to plead sufficient facts to establish that Mr, Debelov acted negligently to support its Section 17(a)(3) claim. To establish negligence under these Sections, the SEC "must show a failure to exercise a standard of reasonable care." *Westhead*, 733 F. Supp. 3d at 1303 (citing *S.E.C. v. City of Miami,*

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

*Fla.,* 988 F. Supp. 2d 1343, 1362 (S.D. Fla. 2013). Although negligence is a lower standard than scienter, the Complaint fails to allege any negligence on behalf of Mr. Debelov, focusing on his knowledge, which is not sufficiently pled. Therefore, the SEC's Section 17(a)(2) and (a)(3) claims must be dismissed.

### b. The SEC Does Not Establish Mr. Salam Acted with Scienter

The SEC's allegations against Mr. Salam are even weaker. The Complaint alleges only that Salam "monitored Go X's website, "communicated" expected returns to customers, and failed to investigate "the truthfulness of the representations" he made to customers. Complaint at ¶¶ 16-21, 36-39. These allegations certainly fall far short of the high standard of scienter which is "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the actor must have been aware of it." *Complete Bus. Sols. Grp., Inc.* 538 F. Supp. 3d at 1330 (quoting *Monterosso*, 756 F.3d at 1335).

According to the SEC, because Mr. Salam monitored the Go X website and his communications with the customers, he should've had knowledge of the purported false sales pitch Go X made to its customers, including the company's alleged failure to provide the returns the customers were promised. Complaint at ¶ 36. Again, this is merely circumstantial evidence, requiring an impermissible logical leap to find that Mr. Salam acted with the required scienter needed to sustain the SEC's claim. However, Rule 9(b) demands particularized facts showing that Mr. Salam actually knew statements were false or acted with such obvious recklessness that the intent to defraud can be inferred. *Mizzaro* 544 F.3d at 1237-1238.  There is none here and as a result the SEC's fraud claims must fail. The SEC assumes that Mr. Salam should have known because of his position at Go X. However, the Complaint does not even contain the allegation that

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Mr. Salam had access to financial information of Go X, let alone that he had knowledge of the actual return customers received from their scooter rentals. To buttress this argument the SEC implies that Mr. Salam should've investigated the truthfulness of the representations made, but that, without more, does not support the finding of scienter. *See Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 120 (D.D.C. 2009)(noting that several Circuits have found that alleging that a defendant, as a corporate officer in a company, "should have known" of misleading or fraudulently-made statements based on that person's position with the company is not enough, by itself, to infer scienter).

Additionally, the SEC attempts to rely on the customer complaints detailed in the Complaint to allege that Mr. Salam should have known the sales pitch was false. Complaint ¶ 37-39. Yet, as discussed above, the Owner Communications merely show typical customer-service issues that were eventually resolved, and not the intent to "deceive, manipulate, or defraud*." United States Sec. & Exch. Comm'n v. Craig*, No. 1:18-CV-4539-LMM, 2021 WL 6102837 at *6 (N.D. Ga. Nov. 8, 2021)*. United States Sec. & Exch. Comm'n v. Craig*, No. 1:18-CV-4539-LMM, 2021 WL 6102837 (N.D. Ga. Nov. 8, 2021) (quoting *McDonald v. Alan Bush Brokerage Co*., 863 F.2d 809, 815 (11th Cir. 1989)). Therefore, the SEC's failure to plead that Mr. Salam acted with scienter defeats the claims under Section 10(b), Rule 10b-5(a)-(c), and Section 17(a)(1), and they must be dismissed.  *S.E.C. v. Roanoke Tech. Corp.,* No. 05-CIV-01880, 2006 WL 2470329, *5-*6 (M.D. Fla. Aug. 24, 2006) (dismissing complaint alleging securities fraud violations where the SEC failed to satisfy the pleading requirements for scienter). Similarly, absent from the Complaint is any allegation that Mr. Salam acted with negligence to sustain a claim under Section 17(a)(3). No duty of care has been breached to the owners of the scooters, nor does the Complaint allege any.  Accordingly, the SEC's Section 17(a)(3) claim must be dismissed against Mr. Salam.

### c.   The Complaint Fails to Allege that Go X Acted with the Requisite Intent

Moreover, even if the SEC had sufficiently alleged misstatements (it has not), its claims against Go X also fail because the Complaint does not plead scienter as to the corporate entity itself. Corporate liability for securities fraud is only properly alleged where the corporate officer who made the challenged misrepresentation personally possessed the requisite scienter. In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326 (S.D. Fla. 1999) (holding that scienter of corporation's officers is properly imputed to the corporation itself); *Mizzaro* 544 F.3d at 1254.

Here, the SEC fails to identify any corporate officer of Go X who acted with the requisite scienter or negligence to maintain their claims. As discussed above, the Complaint does not sufficiently plead that Mr. Debelov or Mr. Salam acted with negligence or even scienter. Without pleading scienter or negligence on the part of officers of Go X, there can be no primary violation attributable to Go X as a corporate entity. *See In re Apple Computer. Inc. Sec. Litig.,* 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter....").

Accordingly, since the Complaint fails to properly allege scienter or negligence on behalf of Mr. Debelov or Mr. Salam, the Go X cannot be held to have possessed the requisite intent, and thus the SEC's claims under 10(b), Rule 10b-5(a)-(c), and Section 17(a)(1)-(3) must be dismissed with prejudice.

### IV.   Conclusion

WHEREFORE, Defendants, CHEETAH X INC. d//b/a GO X, ALEXANDER DEBELOV, and KHODOR SALAM, respectfully requests this Honorable Court grants it Motion to Dismiss with prejudice and grant any further relief this Court deems just and proper.

Dated: October 3rd, 2025                    Respectfully submitted,

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX

Case No.: 1:25-cv-23002-BB

COLE, SCOTT & KISSANE, P.A.
*Counsel for Defendants CHEETAH X INC.*
*(d/b/a Go X); ALEXANDER DEBELOV; and*
*KHODR SALAM*
Esperanté Building
222 Lakeview Avenue, Suite 500
West Palm Beach, FL 33401
Telephone: 561-383-9200
Facsimile: (561) 683-8977
Email: Jonathan.vine@csklegal.com
Email: Leslie.vargo@csklegal.com
Email: justin.kolnick@csklegal.com

By: */s/Justin Kolnick*
S. JONATHAN VINE
Florida Bar No. 10966
JUSTIN KOLNICK
Florida Bar No. 1059202

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of October 2025, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the court via CM/ECF, which will send notice of electronic filing to all counsel of record.

By:     */s/Justin Kolnick*
JUSTIN KOLNICK
Florida Bar No.: 1059202

**COLE, SCOTT & KISSANE, P.A.**
ESPERANTE BUILDING - 222 LAKEVIEW AVENUE, SUITE 500 - WEST PALM BEACH, FLORIDA 33401 (561) 383-9200 - (561) 683-8977 FAX