UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 25-cv-23002-BLOOM/Elfenbein

SECURITIES AND EXCHANGE COMMISSION,

 Plaintiff,

v.

CHEETAH X INC, *d/b/a* X, ALEXANDER
DEBELOV, and KHODR SALAM,

 Defendants.

_____/

## OMNIBUS ORDER ON DEFENDANTS' MOTION TO CHANGE VENUE AND MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendants Cheetah X Inc. ("Go X"), Alexander Debelov ("Debelov"), and Khodr Salam's ("Salam") Motion to Change Venue, ECF No. [26], and Motion to Dismiss, ECF No. [25]. The Plaintiff Securities and Exchange Commission ("SEC") filed Responses in Opposition, ECF Nos. [31], [32]. Defendants filed Replies in Support. ECF Nos. [35], [36].  The Court has reviewed the Motions, the supporting and opposing submissions, the record, and is otherwise fully advised. For the reasons that follow, the Motion to Transfer Venue is denied and the Motion to Dismiss is denied.

## I. BACKGROUND

According to the SEC's Complaint, from July 2021 through November 2023, Go X, Go X's founder, majority owner, and CEO Debelov, and Go X's President of Operations Salam raised approximately $4 million from about 300 investors across multiple states through the fraudulent and unregistered sale of securities. ECF No. [1] ¶ 15. Go X operates a scooter rental business in markets located in U.S. cities including Honolulu, Hawaii; Las Vegas, Nevada; Daytona Beach, Florida; and other Florida cities. *Id*. ¶ 14.

The Defendants promoted Go X's investment program on its public website, in videos posted on YouTube, in direct communications with prospective investors, and in written agreements. *Id*. ¶ 15. When individuals expressed interest in the Go X investment through the Go X website, Debelov provided Salam with their contact information to follow up, and Salam would reach out to the prospective investors to describe the investment program the expected rates of return, and that investors would receive monthly payments of their returns. *Id*. ¶ 16.

About half of the investors signed written agreements ("investor agreements") with Go X to effect their investments. *Id*. ¶ 17. Debelov approved and signed the investor agreements on behalf of Go X. *Id*. Both Debelov and Salam provided investors with investor agreements to sign by emailing the investor a website link to an electronic copy of the agreement. *Id*. Investors who were not provided investor agreements effectuated their investment by paying Go X their principal investment amounts. *Id*. Investors paid between $2,000 and $30,000 for an investment, some of whom made multiple investments. *Id*. ¶ 18. Investor funds were comingled in common bank accounts that Go X used to pay its general operating expenses. *Id*. The investor agreements stated: "Go X will take care of all operations, provide the software solution, fix and deploy scooters at all partner locations. Go X will also retain a legal firm, PR firm and run online ads in order to increase the rentability of scooters. . . All of this will help the [investor] recoup and earn. . .interest on their purchase in the most reasonable time frame." *Id*. ¶ 19. Echoing this language, Salam sent emails and text messages to prospective and existing investors stating: (i) "Investing in Go X is an opportunity to earn passive income by owning a percentage of our fleet;" (ii) investors were "tapping into" Go X's "total revenue" from all of its markets; and (iii) "You don't own 25 individual scooters; rather, you hold a stake in the earnings generated collectively by 1,500

scooters across our Hawaii and Florida markets." Debelov also emailed existing investors representing that the Go X investment program offered "passive income." *Id*. ¶ 20.

In promoting the Go X investment program, Defendants told investors to expect profit-sharing would provide investors with extraordinary returns in a short period of time with exceptionally low risk. *Id*. ¶ 23. Go X made the following claims on their website:

- YOU MAKE $ WHEN SOMEONE RENTS A SCOOTER FROM US. WE WILL SHARE 50% OF THE GROSS PROFIT" (emphasis in original)
- Through such profit-sharing, an investor could "1.5X YOUR MONEY" in as little as "88 days"
- "INVESTORS ON GO X PLATFORM EARNED" more than $3 million "IN THE LAST 180 DAYS"
- A person who "in August 2021 . . . invested $20k into Go X" would have achieved a "gain" of "+100%" by May 2022
- The 100 percent gain "is just compared [sic] based on returns, but if you look at other attributes of this investment like risk-tolerance, liquidity and your ability to lose money, then Go X stands in a completely different league (!) compared to all investments on the market"
- Unlike investors in the S&P 500, Go X investors had "0 Risk" and "[No] . . . Ability to Lose Money . . . *Unless Go X goes out of business"

*Id*. ¶ 24. In separate YouTube videos, Debelov claimed early investors had made returns of "I think it was 100 percent over twelve months" and that later investors were "getting a 50 percent return." Debelov also claimed Go X provided investors with "monthly cash flow." *Id*. ¶¶ 25, 26.

In January 2023, Salam claimed in text messages to a prospective investor that the Go X "platform" was "completely sold out" and had "limited availability right now," but allowed the prospect to invest a "max" of "$20k" and assured the prospect that he could expect a fifty percent return in one year. *Id*. ¶ 27. Moreover, Salam and Debelov each sent prospective investors emails claiming "our investors [had] made over $3M on the platform. As we calculated the average rate of return across all markets, it came out to an astonishing 87% annual return for a typical investor on [the] Go X platform!" (emphasis in original). *Id*. Their emails also claimed that the Go X investment was "no-risk," provided "monthly payouts," and "produces returns that are 4x of

leading funds." *Id.* The investor agreements included statements that 1.0 investors could expect to "be paid" double their investment amount and expect to "earn that money anywhere between 3-6 months"; that the "majority" of 1.0 investors had "doubled or were on track to double their funds within 6-11 months of their initial investment"; that 2.0 investors "should expect to 1.5x their investment within 6-12 months"; and that 2.0 investors would "be paid monthly on their earnings." *Id.* ¶ 28.

Go X accounting records, which Debelov reviewed, show they returned only $1.45 million to investors, less than the $3 million it claimed to have returned. *Id.* ¶ 33. Go X's scooter rental revenue during 2021 through 2023 totaled roughly $8.5 million. *Id.* ¶ 34. Go X recorded a negative net income in each of 2021, 2022, and 2023, with a cumulative recorded negative net income across the three years of approximately $1 million. *Id.* From at least June 2022 to November 2023, Debelov received multiple complaints from dissatisfied investors, including complaints about not receiving expected returns and unpaid refunds. *Id.* ¶ 35. In June 2022, Salam was copied on an investor's email complaining to Debelov where the investor stated: "I've reached out a few times and I'm wondering what I need to do to start getting my monthly payouts. . . It's been several months and I still have yet to get a single payout from my balance." *Id.* ¶ 37. Debelov and Salam received numerous similar emails from investors from March 2023 to August 2023. *Id.*

Though Go X through Debelov and Salam offered and sold approximately $4 million in securities to approximately 300 investors residing in multiple states, no registration statement was on file with the SEC or in effect for any of these offers or sales, and no exemption from registration applied to the offers or the sales. *Id.* ¶¶ 41, 42.

On July 3, 2025, the SEC filed a Complaint against Go X, Debelov, and Salam alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Counts I-III), violations of

4

Section 17(a)(1) of the Securities Act (Count IV), violations of Section 17(a)(2) of the Securities Act (Count V), violations of Section 17(a)(3) of the Securities Act (Count VI), and violations of Violations of Sections 5(a) and 5(c) of the Securities Act (Count VII).

Defendants now move to transfer venue to the Middle District of Florida ("Middle District"), arguing the locus of operative facts, concentration of key witnesses, and the convenience to the Defendants and key witnesses warrant transfer in the interests of justice. *See generally* ECF No. [26]. The SEC responds that its choice of forum is the Southern District of Florida ("Southern District"), and the Defendants have failed to meet their heavy burden to justify transfer to the Middle District. ECF No. [32] at 2.

In the alternative, Defendants seek to dismiss the Complaint, arguing the SEC does not have authority to bring this suit because the purchase of scooters are not securities, but even if the scooters were securities, the SEC has failed to state a claim because they have not properly pled scienter or negligence with respect to any material misrepresentations. ECF No. [26]. The SEC responds that the Go X scooters are investment contracts under the test set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and it has sufficiently pled scienter as to the violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder as well as Sections 17(a)(1), (2), and (3) of the Securities Act. ECF No. [31].

## II.   LEGAL STANDARD

### A.  Transfer of Venue

The transfer statute, 28 U.S.C. § 1404(a), which embodies a codification and revision of the *forum non conveniens* doctrine, *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 253 (1981), provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "Section 1404(a) reflects an increased desire to have federal civil suits tried in the federal

system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack,* 376 U.S. 612, 616 (1964). The statute grants broad discretion to the district court. *See Osgood v. Disc. Auto Parts, LLC,* 981 F.Supp.2d 1259, 1263 (S.D. Fla. 2013) (stating that the "standard for transfer under 28 U.S.C. § 1404(a) leaves much to the broad discretion of the trial court") (citation omitted); *see also Piper Aircraft,* 454 U.S. at 253 (noting that "[d]istrict courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of *forum non conveniens*") (citation omitted); *Motorola Mobility, Inc. v. Microsoft Corp.,* 804 F.Supp.2d 1271, 1275 (S.D. Fla. 2011) ("The Court has broad discretion in determining whether these factors suggest that transfer is appropriate.").

In determining the appropriateness of transfer, courts employ a two-step process. *See Osgood,* 981 F.Supp.2d at 1263 (citing *Abbate v. Wells Fargo Bank, Nat. Ass'n,* 2010 WL 3446878, at *4 (S.D. Fla. Aug. 31, 2010)); *Precision Fitness Equip., Inc. v. Nautilus, Inc.,* 2008 WL 2262052, at *1 (S.D. Fla. May 30, 2008) (citing *Thermal Techs., Inc. v. Dade Serv. Corp.,* 282 F.Supp.2d 1373, 1376 (S.D. Fla.2003); *Jewelmasters, Inc. v. May Dep't Stores,* 840 F.Supp. 893, 894–95 (S.D. Fla.1993) (citing *Cont'l Grain Co. v. The Barge FBL–585,* 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960))). First, the district court is tasked with determining whether the action could have been pursued in the venue to which transfer is sought. *See Osgood,* 981 F.Supp.2d at 1263 (citing *Abbate,* 2010 WL 3446878, at *4). With regard to this first prong, an action "might have been brought" in any court that has subject-matter jurisdiction, where venue is proper, and where the defendant is amenable to process issuing out of the transferee court. *Windmere Corp. v. Remington Prods., Inc.,* 617 F.Supp. 8, 10 (S.D. Fla. 1985) (citing 15 C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 3845 (1976)). Second, "courts assess whether convenience and the interest of justice require transfer to

6

the requested forum." *Id.* (citation omitted). In analyzing this second prong, the Court applies several factors weighing various public and private interests. *See Motorola Mobility,* 804 F. Supp. 2d at 1275–76.

### B. Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* "A facially plausible claim must allege facts that are more than merely possible. . . . But if allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the allegations satisfy the elements of the claims asserted, a defendant's motion to dismiss must be denied. *See id.* at 556.

Further, "[o]n a Rule 12(b)(6) motion to dismiss, '[t]he moving party bears the burden to show that the complaint should be dismissed.'" *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1228 (S.D. Fla. 2014) (quoting *Mendez-Arriola v. White Wilson Med. Ctr. PA*, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010)); *see also Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007) ("We are required to accept the facts as set forth in the plaintiff's complaint as true, and our consideration is limited to those facts contained in the pleadings and attached exhibits.").

## III.   DISCUSSION

### A.  Motion to Transfer Venue

The Parties agree that venue would be proper in the Middle District. ECF Nos. [26] at 6, [32] at 9. Therefore, the Court turns to whether convenience and the interests of justice require transfer to the requested forum.

Whether to grant a transfer in the interest of justice is discretionary. *See Pinson v. Rumsfeld*, 192 Fed. Appx. 811, 817 (11th Cir. 2006). There are nine factors provided by the Eleventh Circuit to help in determining whether to exercise such discretion. *See Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005). Those factors are: "(1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances." *Church-Koeqel*, 2020 WL 5535759, at *2 (*citing Manuel*, 430 F.3d at 1135 n.1). If there is a neutral factor it "does not favor transfer." *Id*. (citing *Watson v. Community Edu. Ctrs.*, 2011 WL 3516150, at *5 (M.D. Fla. Aug. 11, 2011)).

While those factors guide the analysis, courts traditionally give significant deference to a plaintiff's choice of forum. *Young v. Garlapati*, Case No. 24-20919-CV, 2024 WL 5147404, at *1 (S.D. Fla. Aug. 5, 2024) (citing *In re Ricoh*, 870 F.2d at 573). "'[U]ltimately, transfer is only appropriate where the balance of convenience of the parties strongly favors the defendant.'" *Fruitstone*, 464 F. Supp. 3d at 1277 (quoting *Steifel Labs., Inc. v. Galderma Labs., Inc.*, 588 F. Supp. 2d 1336, 1339 (S.D. Fla. 2008)); *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996)).

### i.   Convenience of the Witnesses

First, the Defendants argue the Middle District will be the most convenient forum for the witnesses. In support, they argue they have identified 36 scooter owners, 136 business partners, and 50 employees throughout the Middle District that they plan to introduce as witnesses during trial or who could provide relevant testimony at trial. ECF No. [26] at 10-11 (citing ECF No. [26-1]). Conversely, Go X points out the SEC has only identified one witness located in the Southern District. *Id.*

The SEC responds that the Defendants have failed to show that any witness is unwilling to travel to the Southern District for trial, or that deposition testimony would not suffice, if necessary. ECF No. [32] at 10. The SEC further argues that within the Complaint, it has identified at least 6 investors who reside in the Southern District, including Teresa Bond, who the SEC considers a key witness in that she provided a sworn declaration the SEC has used in support of allegations made in the Complaint. *Id.* at 11.

Here, the Defendants offer no argument or evidence demonstrating that any of the various potential witnesses they identified would be inconvenienced by litigating in the Southern District. *See Exotropin, LLC v. DP Derm, LLC,* No. 25-CV-20713, 2025 WL 2306200, at *7 (S.D. Fla. Aug. 11, 2025) (citing *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1164 (S.D. Fla. 2017)). Rather, the Defendants merely provide a list of witnesses within the Middle District as justification for a transfer. That is insufficient. *See Carroll v. Texas Instruments, Inc.,* 910 F. Supp. 2d 1331, 1335 (M.D. Ala. 2012) ("the Court should 'not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum.'") (quoting *Neil Bros. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 329 (E.D.N.Y. 2006)); *see also Microspherix LLC v. Biocompatibles, Inc.*, No. 9:11-CV-80813-KMM, 2012 WL 243764, at *3 (S.D. Fla. Jan. 25, 2012) ("In assessing the convenience of the witnesses, the mere length of an

individual parties' list of potential witnesses is not of great significance."); *Dale v. United States*, 846 F. Supp. 2d 1256, 1258 (M.D. Fla. 2012) ("the Court will not simply 'tally the number of witnesses' in each prospective forum to determine which is more convenient.). While the Defendants do argue their 36 customers are "key witnesses", the Defendants fail to explain why the testimony of any individual witness is significant enough that the witnesses' presence would be necessary at trial. The Defendants bear the burden of establishing that transfer is warranted and "must support its motion by clearly specifying the key witnesses to be called and particularly stating the significance of their testimony." *Steifel Lab'ys, Inc.*, 588 F. Supp. 2d at 1340. The Defendants' general summary of testimony as applied to all 36 customer witnesses is insufficient and this factor weighs against transfer.

### ii. Location of Relevant Documents

The Parties agree that technological advances have rendered the physical location of documents and other types of proof virtually irrelevant. *Microspherix LLC v. Biocompatibles, Inc.*, No. 9:11-CV-80813-KMM, 2012 WL 243764, at *3 (S.D. Fla. Jan. 25, 2012) ("In a world with fax machines, copy machines, email, overnight shipping, and mobile phones that can scan and send documents, the physical location of documents is irrelevant. In light of the burden a party moving for transfer bears, absent a showing by the moving party to the contrary, this Court considers the location of relevant documents and the relative ease of access to sources of proof a non-factor."). The Defendants have not provided argument that available technological tools are insufficient to address the potential needs of this case. *See Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1283 (S.D. Fla. 2020). As such, the location of relevant documents weighs against transfer.

### iii.   Convenience of the Parties

The Defendants argue the Middle District is more convenient for the Parties, as two of the three Defendants reside in the Middle District. *Id*. at 14. In support, the Defendants cite *Sec. & Exch. Comm'n v. Walker*, No. 20-62564-CIV, 2021 WL 5088853 (S.D. Fla. Aug. 16, 2021), in which the court found unpersuasive an argument that the SEC would be massively inconvenienced by transfer to a district in which they had no office or local counsel. 2021 WL 5088853 at *3. In *Walker*, the Court emphasized that this factor calls for a balancing of the convenience to the parties, not their attorneys. *Id*. (citing *Church-Koegel*, 2020 WL 5535759, at *4).

The SEC responds that Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient. ECF No. [32] at 12 (citing *Van Dusen v. Barrack*, 376 U.S. 612 at 645-46 (1964)). The SEC argues that transfer to the Middle District merely shifts the inconvenience to the SEC, which weighs against transfer. *Id*. Moreover, the SEC contends that the only Defendant who resides in the Middle District is Salam who chose to subject himself to the Southern District when he held positions in Go X. *Id*. (citing *Van Dusen* 376 U.S. at 633) ("There is nothing, however, in the language or policy of s 1404(a) to justify its use by defendants to defeat the advantages accruing to plaintiffs who have chosen a forum which, although it was inconvenient, was a proper venue.").

"'[T]he convenience of the parties...concerns the appearance of employees at court, and, to some extent, the appearance of counsel.'" *Tuuci Worldwide, LLC v. S. Frankford & Sons, Inc.*, No. 23-20615-CIV, 2023 WL 5275187, at *11 (S.D. Fla. Aug. 16, 2023*)* (quoting *Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc.*, 761 F. Supp. 2d 1322, 1328 (M.D. Fla. 2010)). This analysis requires weighing any inconvenience to Defendants against the corresponding burden on Plaintiff if the case were transferred. *Id.* at *11 (citing *Burger King Corp. v. Thomas*, 755 F. Supp. 1026, 1030 (S.D. Fla. 1991)).

Upon consideration, the Court is unpersuaded that this factor weighs in favor of transfer. As to the convenience of the parties, this factor is "practically irrelevant to whether the motion to transfer should be granted." *Cent. Money Mortg. Co. v. Holman*, 122 F. Supp. 2d 1345, 1346 (M.D. Fla. 2000). Although the Defendants may be inconvenienced by travelling to the Southern District, the same can be said for the SEC if it is forced to travel to the Middle District. "Where a transfer 'merely shifts the inconvenience from one party to another, Plaintiff's choice of forum should remain.'" *Mason v. Smithkline Beecham Clinical Lab'ys*, 146 F. Supp. 2d 1355, 1361 (S.D. Fla. 2001) (quoting *Eye Care International, Inc. v. Underhill*, 119 F.Supp.2d 1313, 1319 (M.D. Fla. 2000)).

### iv. Locus of Operative Facts

The Defendants argue that while Go X operates in various states and markets throughout the United States, the Middle District serves as the locus of operative facts in this case. ECF No. [26] at 15. The Defendants point out that Go X's Florida operations are exclusive to the Middle District, 37 of the 39 scooter purchasers lived in the Middle District, and Go X never deployed any scooters or generated any revenue in the Southern District. *Id*. at 16-17. The SEC responds that the basis of their Complaint stems from the Defendants' "fraudulent and unregistered sale of securities through Go X's investment program" which took place between 2021 and 2023. ECF No. [32] at 13. The SEC points out that Debelov testified that "all of the work for the investment platform in 2021 was done in the Miami office." ECF No. [32-2], Debelov Dep. 456:13-457:9.

"The locus of operative facts refers to the specific action or omissions that gave rise to the cause of action." *Hagin v. TA Operating*, LLC, 2014 WL 1385709, *3 (S.D. Fla. Apr. 9, 2014). While the Defendants argue that Go X's operations are exclusive to the Middle District, they also acknowledge that a minority of customers did reside in the Southern District at the time of purchase. ECF No. [36] at 8. Moreover, Debelov's testimony shows the work on the investment

plan, which is the basis of the SEC's Complaint, was done within the Southern District. As such, the Court finds the locus of operative facts span both the Middle and Southern District and finds this factor is neutral. *See Plain Bay Sales, LLC v. Gallaher,* No. 18-80581-CIV, 2018 WL 8899305, at *4 (S.D. Fla. July 11, 2018) (noting that this factor does not weigh in favor of transfer where the operative facts occurred in both plaintiff's chosen forum and the proposed transfer forum).

### v. Availability of Process to Compel Attendance of Unwilling Witnesses

The Defendants acknowledge that, at this juncture, "there is no evidence of unwilling witnesses…" ECF No. [26] at 17. Thus, this factor does not tilt in favor of transfer. *See, e.g.*, *Legg v. Quicken Loans, Inc.*, No. 14-61116-CIV, 2015 WL 13753742, at *3 (S.D. Fla. Mar. 6, 2015) (determining that the fifth factor "does not weigh in either party's favor at this early stage" where "[n]either party has identified any witnesses that are potentially unwilling to participate at trial and thus the availability of process to compel the attendance of unwilling witnesses is a non-issue"); *Roy*, 2014 WL 12783276, at *2 (convenience of witnesses and availability of process to compel attendance did not weigh in favor of transfer where defendant did "not identify any non-party witnesses who are unwilling to testify"); *Figueroa v. Sharper Image Corp.*, No. 05-21251-CIV, 2005 WL 8154985, at *3 (S.D. Fla. Dec. 13, 2005) (noting that transfer may be denied "where the movant does not show that the witnesses would be unwilling to testify") (quoting *Mason,* 146 F. Supp. 2d at 1361-62); *Perlman v. Delisfort-Theodule*, No. 09-80480-CIV, 2010 WL 11504751, at *2 (S.D. Fla. Mar. 30, 2010), *aff'd*, 451 F. App'x 846 (11th Cir. 2012) (denying transfer where movant "has identified no witnesses who would be unwilling to travel to Florida to testify or who could not be compelled to do so").

### vi. Relative Means of the Parties

The Defendants argue that maintaining this action in the Southern District puts a significant burden on Debelov and Salam, as neither Defendant resides in the district and will bear significant travel costs to attend hearings and trial in Miami. ECF No. [26] at 18. Moreover, the Defendants point out that Debelov and Salam's attendance will force them to take time away from their responsibilities as CEO and President of Operations of Go X. *Id*. The Defendants acknowledge the SEC's litigation counsel will be burdened by transfer to the Middle District, but contend the SEC has a comparably minimal burden given that it is "backed by the federal government." *Id*. at 19.

The SEC responds that it does not have unlimited resources and relies on *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662 (7th Cir. 2003), in which the Seventh Circuit stated, "When government lawyers and investigators incur time and travel costs to litigate in a remote forum, the burden falls on the taxpayer, who finances the federal government and who is no less worthy of the protection of the law than corporate officers, shareholders, and employees." 347 F.3d at 665. The SEC also points out that the Defendants' claim of financial hardship is not supported by credible evidence. ECF No. [32] at 14.

The Court notes that the Defendants provide no specific evidence showing an inability to incur litigation costs in the Southern District. Instead, they rely upon arguments of convenience. As such, this factor is neutral. *See Steifel Lab'ys, Inc.*, 588 F. Supp. 2d at 1341 (finding the relative means of the parties not dispositive where there was no evidence before the Court as to either parties' inability to incur the cost of litigation regardless of venue); *Ward v. Figure Lending*, LLC, No. 123CV00516MLBRDC, 2023 WL 6194046, at *6 (N.D. Ga. June 21, 2023) (weighing the relative means of the parties neutral where plaintiff has not alleged his financial situation would meaningfully impede his ability to litigate the case in either forum).

### vii. The Forum's Familiarity with the Governing Law

The Defendants "do not contend that the Southern District of Florida is not capable of applying the federal securities laws that form the basis of the SEC's allegations." ECF No. [26] at 19. Accordingly, this factor does not support transfer.

### viii.   Weight Accorded to Plaintiff's Choice of Forum

The Defendants argue the SEC's choice of forum should not receive any deference from the Court as "nearly all of the facts of the case take place outside the Southern District of Florida." ECF No. [26] at 20. The Plaintiff responds that its choice of forum should be given deference.

A "plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations." *Robinson*, 74 F.3d at 260. Indeed, "transfer can only be granted where the balance of convenience of the parties strongly favors the defendant." *Steifel Labs., Inc.*, 588 F. Supp. 2d at 1339 (citing *Robinson*, 74 F.3d at 260). Defendant has not shown that transfer is appropriate. Although they argue it is more convenient for them to litigate in the Middle District, the Defendants have not demonstrated that this factor should be given near-dispositive weight. Likewise, they have not shown that the factors, when assessed as a whole, weigh so strongly in its favor that Plaintiff's choice of forum should be disturbed.

### ix.  Trial Efficiency and the Interests of Justice

The Defendants argue the public interest, practical issues, and interests of justice counsel in favor of transfer. ECF No. [26] at 20. Specifically, the Defendants argue the Middle District has a greater interest in deciding this case. *Id*. Defendants further argue the interests of justice will be better served in the Middle District because the trial there will be much more likely to be based on presentation of live testimony by the key witnesses. *Id*. The SEC responds that the Defendants have fallen short of their burden to show that the interests of justice outweigh the SEC's choice of

forum and the practical considerations that favor venue in the Southern District. ECF No. [32] at 15.

Upon review, the Court finds that, although the Defendants may be burdened by litigating in this forum, trial efficiency and the interests of justice do not weigh in their favor. As the Court previously explained, the Defendants' arguments as it relates to convenience are unpersuasive, and they have failed to show that any key witness will be unable to travel to the Southern District for his or her testimony. The Court determines, after consideration of all the factors, that transfer is not appropriate.  Accordingly, the Motion is denied.

### B. Motion to Dismiss

#### i. Whether the Scooters are Securities

The Defendants argue they are entitled to dismissal because the SEC has brought its claims under both the Securities Act and Exchange Act, which apply only to financial instruments that qualify as securities. ECF No. [25] at 7. Defendants contend that their agreements were sales agreements for the purchase of scooters, and therefore, sale of goods, and sales of goods do not constitute securities under the Securities Act. *Id*. at 8. Moreover, Defendants contend that the fact investors may obtain rental income from the purchase of their scooters does not transform the good into a security, and the economic reality of the investor agreements demonstrate the transaction was first, for the sale of goods, and second, an opportunity to earn rental income on the goods purchased. *Id*. at 10.

The Defendants contend the SEC has failed to sufficiently plead the third prong of the *Howey* test. *Id*. at 11. Specifically, Defendants argue the SEC fails to show that the "expectation of profits" as it relates to the scooters, "was to be derived solely from the efforts of others." *Id*. at 12. (citing *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999)). Defendants argue the agreements stated that profit from the rental scooters would fluctuate due to seasonality and that

rental income was dependent upon the number of rides the scooters received. *Id*. at 13. The Defendants contend that buyers of the scooters required some "good fortune" outside the managerial skills of the Defendants. *Id*. Moreover, the Defendants point out that the agreement provides that buyers retain control over the scooters and at any time prior to receiving the scooter's full value in rental profits, a buyer can return the scooter to Go X in exchange for the full purchase price. *Id*. Thus, the Defendants aver that the success of the scooter rentals is not sufficiently related to the efforts of the Defendants and therefore not a security. *Id*. The Defendants cite several cases to support their arguments: First, they cite *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497 (S.D.N.Y. 1986), in which tenants who opposed the conversion of their apartment building into condominiums argued the conversion plan involved the offer of securities because the tenants were required to make a $1,000 deposit to subscribe to an offering plan, which the tenants argued constituted an investment contract. 632 F. Supp. at 498-99. Ultimately, the Court determined that neither the contracts nor the alleged options to buy condominiums were investment contracts because the tenants did not expect to earn profits solely from the efforts of a promoter or a third party but rather were drawn in by an expectation of appreciation in value. *Id*. at 501. Moreover, the Court reasoned that "a piece of real estate, such as a condominium, has an inherent worth, a worth not solely dependent on the efforts of a promoter." *Id*.

Second, the Defendants cite *S.E.C. v. Belmont Reid & Co., Inc.*, 794 F.2d 1388 (9th Cir. 1986), in which the defendants sought to raise capital by selling gold coins or medallions minted from future gold production. Purchasers could pay for each coin separately, thirty days in advance of delivery, or they could prepay for an entire set of coins. Under the thirty-day plan, the world market price of gold determined the price of the coins and under the prepayment plan, the prices were fixed. 794 F.2d at 1389. The Ninth Circuit concluded that the transaction was not a security

because the purchasers were speculating in the world gold market, not the managerial efforts of the defendants. *Id*. at 1391. Similarly, the Defendants cite *Noa v. Key Futures, Inc.*, 638 F.2d 77, 78 (9th Cir. 1980), in which the defendants sold silver bars and touted them as a superior investment. The Ninth Circuit determined that once a buyer purchased the silver bars, profits depended on the fluctuations of the silver market, not on the managerial efforts of the sellers and therefore, was not a security. 638 F.2d at 80.

The SEC responds that the Defendants' "narrow and misleading description of Go X's business misrepresents the nature of the investment program Defendants offered and sold to the public." ECF No. [31] at 7. The SEC contends that the Defendants did not merely sell scooters but:

> offered an investment program which offered its investors a share of Go X's gross profits from scooter rental fees, in exchange for the investors' principal payment to Go X, which typically ranged from $2,000 to $30,000. Defendants' sales pitch touted Go X's investment program as less risky than investing in the S&P 500, an index of approximately 500 of the largest publicly traded companies.

*Id*. The SEC argues the third prong of the *Howey* test is met because investors were led to expect profits from the efforts of the Defendants. Specifically, the SEC argues investors expected a return on their investment based on the Defendants' "launching operations in various markets; advertising and marketing scooters to consumers; recruiting, contracting with, and paying the partners; collecting scooter rental fees; maintaining the scooters; retaining legal and PR firms; and handling permitting and other legal requirements of the cities where Go X operated." *Id*. at 9. Moreover, the SEC points out that investors were told Go X would manage all operations of the scooter rental business while investors would receive passive income. *Id*. 10. The SEC argues the agreements clearly show that investors were not merely sold scooters, but instead the agreements describe an investment in the "Go X Investment Platform" with a promise of profit sharing. *Id*.

18

Moreover, the agreements describe the scooters as "A fleet of scooters to be rented in Go X markets using Go X software, partners and platform." *Id*.

Finally, the SEC contends that the Defendants' reliance upon their cited cases is unavailing. First, the SEC argues that *Bender* supports their position as the Court clarified that an offering of a security would be found where the right to an income stream of rental profits was dependent on the efforts of the rental agents. *Id*. at 12 (citing *Bender*, 632 F. Supp. At 501). The SEC argues such a situation is present here, where Go X provided an ongoing economic benefit through its rental platform. *Id*. Moreover, the SEC avers that *Belmont* and *Noa* are not pertinent in that those cases were at the summary judgment phase and hinge on factual determinations as to the managerial efforts made by the defendants. *Id*. at 12-13.

The Securities Act of 1933 defines "security" broadly to include "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract. . ." 15 U.S.C § 77b(a)(1). The Eleventh Circuit has recognized that "'investment contract' has the same meaning under the Securities Act and the Exchange Act." *S.E.C. v. Merch. Cap.*, LLC, 483 F.3d 747, 754 n.6 (11th Cir. 2007). To determine whether something is an investment contract is the same analysis as determining whether it is a security because "investment contract" is one of several types of instruments that fall within the statutory definition of "security".

In *Howey*, the Supreme Court established a test to determine whether a particular scheme constitutes an "investment contract": "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301. That definition "embodies a flexible rather than a static principle, one that is capable of adaptation to

meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. In analyzing whether something is a security, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 L.Ed.2d 564 (1967) (citing *Howey*, 328 U.S. at 298). According to the *Howey* test, "an investment contract exists if there is (a) an investment of money, (b) in a common enterprise, (c) based on an expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

Here, the Defendants only challenge whether the SEC sufficiently pled that there was an expectation of profits to be derived from the entrepreneurial of managerial efforts of others. This Court finds there was. Specifically, the SEC alleges in the Complaint that the Defendants told investors they would receive a share of the gross profits and extraordinary returns in a short period of time with exceptionally low risk. ECF No. [1] ¶¶ 22, 23. Moreover, the Complaint alleges that at various times Go X's public website displayed the following:

> • "YOU MAKE $ WHEN SOMEONE RENTS A SCOOTER FROM US. WE WILL SHARE 50% OF THE GROSS PROFIT"
> • Through such profit-sharing, an investor could "1.5X YOUR MONEY" in as little as "88 days"
> • "INVESTORS ON GO X PLATFORM EARNED" more than $3 million "IN THE LAST 180 DAYS"
> • A person who "in August 2021 . . . invested $20k into Go X" would have achieved a "gain" of "+100%" by May 2022
> • The 100 percent gain "is just compared [sic] based on returns, but if you look at other attributes of this investment like risk-tolerance, liquidity and your ability to lose money, then Go X stands in a completely different league (!) compared to all investments on the market"
> • Unlike investors in the S&P 500, Go X investors had "0 Risk" and "[No] . . . Ability to Lose Money . . . *Unless Go X goes out of business"

*Id*. ¶ 24. As to the managerial efforts, the Complaint alleges the agreements stated "Go X will take care of all operations, provide the software solution, fix and deploy scooters at all partner locations.

Go X will also retain a legal firm, PR firm and run online ads in order to increase the rentability of scooters. . . . All of this will help the [investor] recoup and earn . . . interest on their purchase in the most reasonable time frame." *Id*. ¶ 19.

The Court finds the Defendants' reliance on cases such as *Bender*, *Belmont*, and *Noa* unavailing. For example, in *Bender*, the Corut specifically explained that a real estate transaction would involve an offer of a security "in those situations where condominiums are sold to investors with emphasis on the economic benefit to the investors of renting out the condominium through the offices of the condominium management or their agents." 632 F. Supp. at 501. This is precisely the set of circumstances investors found themselves in with Go X's scooters.

As to *Belmont*, the Ninth Circuit affirmed a finding of summary judgment in favor of the defendants after determining that the expectations of profits from gold coins would not come from the efforts of the defendants, but rather from speculation in the world gold market. 794 F.2d at 1391. To that end, the Court determined that to the extent the purchasers relied on the managerial skill of the defendants it was as an ordinary buyer relies on an ordinary seller.[1] *Id*. Here, the facts are different. The relationship between Go X and the purchasers of the scooters was not that of an ordinary buyer and seller. While the Defendants argue the agreement explains that certain market forces will affect the profitability of renting the scooters, such as seasonality, popularity, COVID restrictions, and other unforeseen circumstances, the agreement also explains all the numerous managerial efforts Go X undertakes to help purchasers earn profits. ECF No. [25-1]. The Defendants rely on the fact that the profits are not "solely" from their managerial efforts but

---

[1] *Noa* contains substantially similar facts and results as *Belmont*. *Noa*, also at the summary judgment phase concerned the sale of silver bars, to which the Ninth Circuit determined profits were reliant upon the fluctuation of the silver market rather than the managerial efforts of the Defendants. 638 F.2d at 79.

influenced by market forces in such a way as to fall out of the definition of a security. However, "the original requirement that profits be derived 'solely' from the efforts of others has been modified by later opinions to include only that the efforts of others be merely predominant." *S.E.C. v. Mut. Benefits Corp.*, 323 F. Supp. 2d 1337, 1342 (S.D. Fla. 2004), aff'd, 408 F.3d 737 (11th Cir. 2005). The Eleventh Circuit instead requires this Court ask, "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999). Here, it is undeniable that the failure or success of the scooter rental operation relied upon the Defendants' managerial efforts, which per the agreement included all operations, software solutions, scooter repairs, scooter deployment, legal and public relations, and online ads. ECF No. [25-1]. As such, the Court finds the third prong of *Howey* satisfied. The agreements constituted an investor contract and the scooters, a security.[2]

### ii.   Whether the SEC Sufficiently Pled Scienter or Negligence

The Defendants argue that even if the scooters are securities, the SEC failed to plead scienter or negligence against the Defendants with respect to any purported material misrepresentations or omissions, as is required to state a claim under Section 17(a)(1)-(3) of the Securities Act and to prove a rule 10(b) violation. ECF No. [25] at 16. Therefore, the Defendants argue Counts I, II, III, IV, and VI should be dismissed as to Debelov and Salam, and Counts I through VI should be dismissed as to Go X.

As to Debelov, the Defendants argue his familiarity with Go X's accounting records and knowledge of Go X's revenue do not establish he acted with scienter because the agreements make clear that a scooter owner's rental income was completely isolated from Go X's financial

---

[2] Though the Defendants do not explicitly move to dismiss Count VII, to the extent the Defendants challenge Count VII on the basis that the scooters are not securities, the motion is denied.

performance. *Id*. at 17. The Defendants further argue that the complaints received by Debelov do not show he knew the scooters were not performing as he represented but instead were "cherry-picked" and selected by the SEC to show nothing more than typical customer service issues that arise when running a business. *Id*. at 18.

As to Salam, the Defendants argue the Complaint makes no allegation he had access to the financial information of Go X, nor knowledge of the actual return customers received from their scooter rentals. *Id*. at 20. In support of their argument the Defendants cite *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105 (D.D.C. 2009), in which the Court determined it is insufficient to allege a corporate officer should have known of misleading or fraudulently made statements based upon their position within a company. 662 F. Supp. at 121.

As to Go X, the Defendants argue the SEC has failed to identify any corporate officer of Go X who acted with the requisite scienter or negligence to maintain their claims. *Id*. at 21.

The SEC responds it has sufficiently pled scienter. ECF No. [31] at 18. As for Debelov, the SEC argues he approved misrepresentations on the Go X website. *Id*. at 17. The SEC further argues he made misrepresentations in YouTube videos and personal communications to purchasers. *Id*. at 17. The SEC contends Debelov knew or was severely reckless in not knowing that his investor sales pitch provided a misleading impression of the potential returns and risk of the Go X investment. *Id*. at 18. The SEC alleges Debelov monitored the Go X accounting records which reflected that the claim Go X paid out $3 million in returns was misleading. *Id*.

As for Salam, the SEC argues he made personal misrepresentation to investors when he touted Go X's past performance, expected future performance, and low risk in his personal phone calls emails, and texts. *Id*. at 17. The SEC avers that Salam acted with severe recklessness in promoting Go X because the sales pitch, touting high returns in just a few months with less risk than the S&P

500, was suspicious on its face. *Id*. at 19. Moreover, the SEC distinguishes *Stevens*, because it does not allege Salam's position alone infers scienter. *Id*.

As for Go X, the SEC argues the scienter of both Debelov and Salam is imputed to Go X. *Id*. at 20 (citing *S.E.C. v. Treadway*, 430 F. Supp. 2d. 293, 337 (S.D.N.Y. 2006) ("It is well settled that the scienter of executives can be imputed to corporate entities.")

To establish a violation of Section 17(a)(1) of the Securities Act, the SEC must prove: "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007). Similarly, "[t]o prove a 10(b) violation, the SEC must show (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *Id*. (citing *Aaron v. SEC,* 446 U.S. 680, 695 (1980)). To show that a defendant "violated section 17(a)(2) or 17(a)(3), the SEC need only show (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Id*. "Factual allegations supporting an inference of scienter will also satisfy the lower standard of negligence required for claims under Sections 17(a)(2) and (3) of the Securities Act." *Sec. & Exch. Comm'n v. Westhead*, 733 F. Supp. 3d 1284, 1304 (S.D. Fla. 2024) (citing *S.E.C. v. Coplan*, No. 13-62127-CIV, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014).

The Complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, which requires the Complaint set out "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a

consequence of the fraud." *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)).

### 1. Debelov

As for Debelov, the Complaint alleges he oversaw content posted to YouTube and on the Company's website which made materially false and misleading statements to investors. ECF No. [1] ¶¶ 15, 24-26. The Complaint also alleges he directly communicated with prospective customers and made further misleading statements as to returns and risks associated with the investment. *Id*. ¶ 27. Specifically, the Complaint alleges Debelov made representations that Go X had returned $3 million to customers, despite only returning $1.45 million. *Id*. ¶ 33. The SEC alleges in the Complaint that Debelov knew or was severely reckless in not knowing the $3 million claim was false because Debelov regularly reviewed Go X accounting records showing amounts returned to investors. *Id*. Moreover, the Complaint alleges that the investor complaints show Debelov knew or was severely reckless in not knowing that the Go X investments were not performing as represented in the investor sales pitch. *Id*. ¶ 35.

As the SEC correctly points out, scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). "Scienter can be shown through a defendant's acts of knowing misconduct or through acts demonstrating recklessness." *S.E.C. v. Monterosso*, 768 F. Supp. 2d 1244, 1265 (S.D. Fla. 2011), aff'd, 756 F.3d 1326 (11th Cir. 2014) (citing *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)). Severe recklessness satisfies the scienter requirement. *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of

misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Broad v. Rockwell International Corp.*, 642 F.2d 929, 961 (5th Cir.)). "A defendant's scienter can be proven through direct or circumstantial evidence." *Monterosso*, F. Supp. 2d at 1266 (citing *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1298 (11th Cir. 2004)).

As alleged, Debelov's misleading statements were material. *See S.E.C. v. Merch. Cap.*, LLC, 483 F.3d 747, 768 (11th Cir. 2007) ("It is well established that a materially misleading omission of past performance information occurs when a promoter makes optimistic statements about the prospects of the business but fails to include past performance information that would be useful to a reasonable investor in assessing those statements.") And the SEC sufficiently pled scienter as it relates to Debelov. Severe recklessness can 'be established by allegations that the defendants had knowledge of facts or access to information contradicting their public statements." *In re Netbank, Inc. Sec. Litig.*, No. CIV.A.1:07-CV-2298-B, 2009 WL 2432359, at *12 (N.D. Ga. Jan. 29, 2009) (citing *In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353, 1372 (S.D. Fla. 2001)). At the motion to dismiss stage, the SEC need only plead scienter generally. *S.E.C. v. Levin*, No. 12-21917, 2013 WL 5588224, at *13 (S.D. Fla. Oct. 10, 2013). Debelov's regular review of the accounting records showed that the amount of money returned to investors was less than half of what he represented in statements, coupled with investor complaints allege plausible facts and suggest a reasonable inference that, taken as true, support a finding of scienter. Accordingly, Defendant's Motion to Dismiss Counts I, II, III, IV, and VI is denied as to Debelov.

**2. Salam**

As for Salam, the Complaint alleges Salam provided investors with investor agreements to sign, sent emails and text messages to potential investors about the Go X program and the expected

rate of return, touted that investors had made over $3 million on the platform, and monitored the Go X website. ECF No. [1] ¶¶ 17, 27, 36. The Complaint alleges that in January 2023, Salam claimed in text messages to a prospective investor that the Go X "platform" was "completely sold out" but nonetheless indicated he would allow the investor to invest a "max" of "$20k". *Id*. ¶ 27. The Complaint alleges Salam knew or was severely reckless in not knowing that the Go X sales pitch was false and misleading because he received investor complaints and continued to use a false and misleading sales pitch to investors. *Id*. ¶ 38. Moreover, the Complaint alleges Salam never investigated the truthfulness of the representations he used to solicit investors. *Id*. ¶ 39.

To determine whether the SEC has sufficiently pled scienter, the Court considers the allegations in their entirety, not individually. *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1164 (S.D. Fla. 2004) (citing *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246–7 (5th Cir. 2003); *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1262 (10th Cir. 2001); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195 (1st Cir. 1999)). While any individual allegation may be insufficient to infer scienter, the SEC has pled plausible facts, which taken as a whole, support an inference of scienter. Specifically, Salam monitored the Go X website, which contained past and expected future performance claims, provided investors with agreement forms which echoed those claims as well as a refund guarantee, and directly communicated with investors and prospective investors about the past and expected performance. Salam claimed investors had made over $3 million on the platform and averaged an 87% annual return for investors. ECF No. [1] ¶ 8. Those representations continued after specific customer complaints, which expressed dissatisfaction considering the representations made at the time of prior investments. ECF No. [1] ¶ 37. Accordingly, the Defendants' Motion to Dismiss as to Counts I, II, III, IV, and VI is denied as to Salam.

### 3. Go X

The Defendants argue "the SEC fails to identify any corporate officer of Go X who acted with the requisite scienter or negligence to maintain their claims." ECF No. [25] at 21. The Defendants contend "there can be no primary violation attributable to Go X as a corporate entity. *Id*. However, the Court found the Complaint adequately pleads scienter as to Debelov, founder and CEO of Go X, and Salam, Go X's President of Operations. As the SEC points out and the Eleventh Circuit has held, "[c]orporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010). As such, Debelov's scienter is imputed to Go X. Therefore, the Defendants' Motion to dismiss is denied as to Go X.

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  The Defendants' Motion to Transfer Venue, **ECF No. [26]**, is **DENIED**.

2.  The Defendants' Motion to Dismiss, **ECF No. [25]**, is **DENIED.**

3.  The Defendants shall **RESPOND** to the Complaint **on or before May 4, 2026**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 20, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:

counsel of record